UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA            :

    - v. -                           :

MCKYLE CLYBURN,                     :

              Defendant.    :

- - - - - - - - - - - - - - - - x

INFORMATION

09 Cr. 598

## COUNT ONE

(Conspiracy To Commit Securities Fraud,
Mail Fraud, and Wire Fraud)

The United States Attorney charges:

### RELEVANT PERSONS AND ENTITIES

    1.    At all times relevant to this Information, Sky Capital Holdings Ltd. ("Sky Capital Holdings" or "SKH") was a corporation that purported to provide financial and investment advisory services to corporate clients and private individuals, primarily in the United States and the United Kingdom. Sky Capital Holdings was incorporated under Delaware law in or about 2001, and had its principal place of business in New York, New York. Between in or about July 2002 and in or about October 2006, Sky Capital Holdings' stock was publicly traded on the Alternative Investment Market ("AIM") of the London Stock Exchange ("LSE"). As set forth more fully below, Sky Capital Holdings had several related and subsidiary companies that purported to provide various related services.

2.   At all times relevant to this Information, Sky Capital LLC was a wholly-owned subsidiary of Sky Capital Holdings.  Sky Capital LLC was a securities broker-dealer with its principal place of business in New York, New York.  In or about 2004, Sky Capital LLC opened branch offices in Boca Raton, Florida and Red Bank, New Jersey.  Sky Capital LLC purported to provide retail brokerage, research, equity and fixed income trading services.  Sky Capital LLC was a limited liability corporation incorporated under the laws of the State of New York.

3.   At all times relevant to this Information, Sky Capital UK Limited ("Sky Capital UK") was a wholly-owned subsidiary of Sky Capital Holdings.  Sky Capital UK was a securities broker-dealer with its principal place of business in London, England.  Sky Capital UK was founded in or about 2003.  Sky Capital UK purported to provide private client brokerage services, institutional sales and trading, and research activities.

4.   At all times relevant to this Information, Sky Capital Enterprises Inc. ("Sky Capital Enterprises" or "SKE") was a venture capital firm that purported to provide strategic advice, consulting services and financing to small and mid-size start-up and early stage companies.  Sky Capital Enterprises was previously known as "Sky Venture Capital Inc."  Sky Capital Enterprises was incorporated under Delaware law in or about 2002,

and had its principal place of business in New York, New York. Between in or about March 2004 and in or about October 2006, Sky Capital Enterprises' stock was publicly traded on the AIM.

5. At all times relevant to this Information, Sky Capital Holdings, Sky Capital LLC, Sky Capital UK, and Sky Capital Enterprises were affiliated companies, and all but Sky Capital UK had its principal place of business located at 110 Wall Street, New York, New York. (Sky Capital Holdings, Sky Capital LLC, Sky Capital UK and Sky Capital Enterprises are, unless otherwise specified, collectively referred to in this Information as the "Sky Capital Affiliated Companies" or "Sky Capital"). The Sky Capital Affiliated Companies were under the umbrella of Sky Capital Ventures Ltd.

6. At all times relevant to this Information, a co-conspirator not named as a defendant herein ("CC-1") controlled the Sky Capital Affiliated Companies and exercised day-to-day management authority of those companies either directly or through others. CC-1 founded Sky Capital and served as Chief Executive Officer of both Sky Capital Holdings and Sky Capital Enterprises.

7. The Thornwater Company, L.P. ("Thornwater") was a securities broker-dealer that was founded in or about 1995. Thornwater's principal place of business was in New York, New York. CC-1 joined Thornwater in or about 1997 and gained control

of Thornwater in or about 1999. From in or about 1999 through in or about early 2003, when Thornwater ceased operations, CC-1 was an undisclosed principal of Thornwater who controlled Thornwater and exercised day-to-day management authority of the company either directly or through others.

8. At all times relevant to this Information, GlobalSecure Holdings Ltd. ("GlobalSecure") was a privately-owned company that was incorporated under Delaware law with its principal place of business in Silver Spring, Maryland. GlobalSecure was founded in 2003 under the name "GlobalSecure, Ltd," to provide products and services related to the homeland security industry primarily in the United States. Since in or about July 2005, GlobalSecure has been known as Global Secure Corp. GlobalSecure is an affiliate of Sky Capital Enterprises, which, along with CC-1, holds a controlling interest in GlobalSecure.

9. At all times relevant to this Information, Advanced Spinal Technologies, Inc. ("AST") was a privately-owned company that was incorporated under Delaware law with its principal place of business in Boca Raton, Florida. AST was founded in 2004 to exploit and develop technology related to the treatment of back conditions. AST is an affiliate of Sky Capital Enterprises, which along with CC-1, holds a controlling interest in AST.

10.  From in or about December 1998 through in or about June 1999 and from in or about June 2000 through in or about January 2003, MCKYLE CLYBURN, the defendant, was employed by Thornwater as a broker.  From in or about 2003 until in or about Summer 2006, CLYBURN was employed by Sky Capital LLC as a broker.

### THE SCHEME TO DEFRAUD

11.  From in or about 2000 through in or about August 2006, MCKYLE CLYBURN, the defendant, participated with CC-1 and others in a scheme to defraud investors through the operations of Thornwater and Sky Capital.  CLYBURN, CC-1 and others carried out this scheme by soliciting millions of dollars of funds under false pretenses, failing to use investors' funds as promised, and misappropriating and converting investors' funds for their own benefit and the benefit of others without the knowledge or authorization of the investors.  In furtherance of the scheme, CLYBURN, CC-1, and others employed high-pressure sales tactics and used material misrepresentations and omissions to convince victims to invest millions of dollars first through Thornwater and then through Sky Capital.

12.  In particular, CLYBURN, CC-1 and others associated with Thornwater and Sky Capital convinced victims to invest in various purported investment opportunities, including (i) private placement offerings and (ii) offers to purchase restricted stock.  In connection with the scheme, CLYBURN, CC-1 and others used

high-pressure tactics and manipulative devices to market Sky Capital securities to retail customers, both over the phone and in person.

### Private Placements and Offers to Purchase Restricted Stock

13. With regard to the private placements, participants in the scheme, including CLYBURN, CC-1 and others, promoted offerings related to various holding companies that CC-1 controlled. These holding companies, in turn, typically held an interest in an asset, such as another company, that victims were told would be brought public using investors' funds. Investors also typically were told that the holding company itself would be brought public. In fact, the funds were used to personally enrich CC-1 and others; to pay brokers excessive, undisclosed commissions and to provide the brokers with other undisclosed perks; to keep Sky Capital afloat as an ongoing business; and to pay off prior investors who had lost money in return for commitments from those investors that they would not pursue private claims or contact regulatory authorities. Other than SKH and SKE, none of the entities that was used as a lure to solicit investors was ever brought public.

14. With regard to the offers to purchase restricted stock, participants in the scheme, including CC-1, CLYBURN, and others, told investors that they would receive "Units" of restricted SKH or SKE stock that had been "discounted" from the

...

...

list price of those stocks on the AIM. In fact, as explained in more detail below, the price of this stock appeared to be "discounted" only because brokers at Sky Capital had engaged in conduct to artificially inflate and maintain the list price of the publicly-traded stock on the AIM. This aspect of the scheme was used both to placate prior investors – so as to continue the scheme – and to convince new investors to buy into subsequent SKH and SKE private offerings. Inflating the price of SKH and SKE stock also served to increase the value of assets owned and controlled by CC-1 and others, due to their ownership interests in those entities.

15. With the knowledge of CC-1 and at CC-1's direction, participants in the scheme, including CLYBURN and others, fraudulently induced victims to invest by, among other things: (1) misrepresenting the use of investors' funds; (2) promising returns on the investors' funds that were known to be false; (3) falsely claiming that various "liquidity" events, such as an initial public offering of securities ("IPO") or acquisition by another entity, were imminent; and (4) distributing memoranda and marketing materials that contained materially false information.

16. In furtherance of the scheme, CLYBURN, CC-1 and others used the Sky Capital brokerage business as a means to attract investors. Sky Capital employed cold-callers and brokers

to initiate contact with potential investors who were typically approached in the first instance about investing in a non-Sky Capital stock that was trading on an American stock exchange, such as the New York Stock Exchange ("NYSE") or the National Association of Securities Dealers Automated Quotations ("NASDAQ"). After a period of trading in these stocks, investors were then solicited to invest in a Sky Capital product, such as the publicly-traded SKH and/or SKE stock, or in a private placement related to SKH, SKE or GlobalSecure. Where necessary, investors were encouraged to sell their non-Sky Capital stock, even when that stock had been increasing in value. As investors became more and more invested in the Sky Capital products, brokers at Sky Capital put additional pressure on them to increase their investments, both so they could supposedly realize a gain on their initial investments and to purportedly "average down" their positions in the Sky Capital stock.

### Manipulation of SKH and SKE Stock

17. In furtherance of the scheme, brokers at Sky Capital, including CLYBURN, working at CC-1's direction, engaged in conduct to manipulate the market for SKH and SKE stock and to artificially inflate the share price of those stocks. This conduct included, among other things, (i) using high-pressure tactics and materially false statements and omissions to induce investors to buy SKH and/or SKE stock; (ii) using high-pressure

tactics and materially false statements and omissions to discourage investors from selling SKH and/or SKE stock; (iii) failing to execute customer orders to sell SKH and/or SKE stock; (iv) enforcing a "no net sales" policy whereby brokers were instructed to take steps to ensure that more SKH and SKE stock was purchased by Sky Capital's retail customers than sold; (v) improperly "crossing" SKH and/or SKE stock for the purpose of supporting and maintaining the market price of SKH and SKE; (vi) "parking" stock in customer accounts, meaning placing SKH and/or SKE stock in an investor's brokerage account, often without his or her consent, for the purpose of preventing a sale order from impacting the share price of the stock; (vii) making unauthorized purchases of SKH and/or SKE stock on behalf of retail customers; (viii) manipulating the order and timing of the execution of trades in SKH and/or SKE stock; (ix) encouraging customers to liquidate portions of their brokerage accounts that were not invested in Sky Capital stocks so that the funds could be used to purchase more SKH and/or SKE stock; and (x) using Sky Capital's "error account" as a means of preventing a sale order from impacting the share price of SKH and/or SKE stock in cases in which a buyer for the stock could not be found. The purpose of these practices was to give the appearance that there was demand for the SKH and SKE stock - when in fact there was not - and thereby maintain and increase the share price of those stocks.

**Bribes to Brokers**

18. To encourage brokers at Sky Capital to engage in and continue their unlawful efforts to "support" SKH and SKE stock, CC-1 and others acting at CC-1's behalf, offered the brokers, including CLYBURN, excessive, undisclosed commissions. These payments were often disguised as "advances" or as "special bonuses" for things unrelated to purchasing Sky Capital stock. Brokers also were asked on occasion to sign "promissory notes" to give the appearance that such payments were loans. The brokers were told that they would not have to pay back any of these purported "loans," and in fact they did not repay these "loans."

19. To generate funds to pay brokers for convincing investors to buy Sky Capital stock and to obtain additional money for Sky Capital, participants in the scheme created a "spread" on SKH and SKE stock by negotiating to purchase large blocks of Sky Capital stock from investors at discounted prices. Brokers at Sky Capital then solicited other customers to purchase the same Sky Capital stock at a higher price, thereby creating a profit, which was split between Sky Capital and the brokers.

20. To further enrich themselves, brokers at Sky Capital also engaged in conduct to increase their fees and thereby increase Sky Capital's revenues. This included "churning" customers' accounts, meaning executing trades solely in order to generate commissions.

n
n
n

### Misappropriation of Investor Funds

21. As explained above, victims were told that their investments would be used for legitimate business purposes and that Sky Capital would use investor funds to provide a return on their investments. In fact, substantial portions of these funds were used to enrich CC-1 personally and to support CC-1's lavish lifestyle. Investor funds also were used to pay bribes to brokers to induce them to raise funds for Sky Capital and/or to buy SKH and SKE stock, and to provide CLYBURN and other brokers with additional undisclosed perks. In addition, investor funds were used to pay off prior victims who had lost money investing through Thornwater and/or Sky Capital. To conceal the nature of certain payments, individuals who received payments from Sky Capital, including prior victims and individuals who had provided CC-1 with personal services, were falsely described as "consultants" by Sky Capital, even though they did not, in fact, provide Sky Capital with consulting services.

### STATUTORY ALLEGATIONS

### The Conspiracy

22. From at least in or about 2000 through in or about Summer 2006, in the Southern District of New York and elsewhere, MCKYLE CLYBURN, the defendant, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with others to commit

offenses against the United States, namely, (1) to commit fraud in connection with the purchase and sale of securities, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5; (2) to commit mail fraud, in violation of Title 18, United States Code, Section 1341; and (3) to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

### Objects of the Conspiracy

### Securities Fraud

23. It was a part and an object of the conspiracy that MCKYLE CLYBURN, the defendant, and others known and unknown, unlawfully, willfully, and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, would and did use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making and causing to be made untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit

upon the purchasers and sellers of Sky Capital and other securities, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

### Mail Fraud

24. It was further a part and an object of the conspiracy that MCKYLE CLYBURN, the defendant, and others known and unknown, unlawfully, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, for the purpose of executing such scheme and artifice and attempting so to do, would and did place in post offices and authorized depositories for mail matter, matters and things to be sent and delivered by the Postal Service, and would and did deposit and cause to be deposited matters and things to be sent and delivered by private and commercial interstate carriers, and would and did take and receive therefrom such matters and things, and would and did knowingly cause to be delivered, by mail and such carriers according to the directions thereon, and at the places at which they were directed to be delivered by the persons to whom they were addressed, such matters and things, in violation of Title 18, United States Code, Section 1341.

**Wire Fraud**

25. It was further a part and an object of the conspiracy that MCKYLE CLYBURN, the defendant, and others known and unknown, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

**Means and Methods of the Conspiracy**

26. Among the means and methods by which MCKYLE CLYBURN, the defendant, and his co-conspirators would and did carry out the conspiracy were the following:

    a. CLYBURN and his co-conspirators employed high-pressure sales tactics and used material misrepresentations and omissions to convince victims to invest millions of dollars first through Thornwater and then through Sky Capital.

    b. CLYBURN and his co-conspirators solicited retail customers to invest in private placements in various holding companies that CC-1 controlled.

    c. CLYBURN and his co-conspirators made materially false statements and omissions regarding what investors' funds would be used for.

    d. CLYBURN and his co-conspirators engaged in conduct to manipulate the market for SKH and SKE stock and to artificially inflate the share price of those stocks.

    e. To encourage brokers at Sky Capital to "support" SKH and SKE stock, CC-1 and others acting at CC-1's behalf, offered brokers, including CLYBURN, excessive, undisclosed commissions, which were often disguised as "advances," "loans," or "special bonuses" for things unrelated to purchasing Sky Capital stock.

    f. To generate funds to pay brokers for buying Sky Capital stock and to obtain additional money for Sky Capital, participants in the scheme created a "spread" on SKH and SKE stock by negotiating to purchase large blocks of Sky Capital stock from investors at discounted prices. Brokers at Sky Capital, including CLYBURN, then solicited customers to purchase the same Sky Capital stock at the higher price, thereby creating a profit, which was split between Sky Capital and the brokers.

### Overt Acts

  27. In furtherance of the conspiracy and to effect its unlawful objects, MCKYLE CLYBURN, the defendant, and his co-

conspirators, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

  a. On or about July 19, 2002, CLYBURN obtained a check in the amount of $25,000 drawn from an account related to a private placement at Thornwater. Subsequently, in or about 2003, CLYBURN was asked to and did sign a "promissory note" for this same payment, purporting to memorialize the payment as a loan of $25,000 from "Dorchester Holdings Ltd.," a holding company that had been the subject of a private placement at Thornwater.

  b. On or about August 16, 2005, and August 18, 2005, individuals working with CLYBURN solicited Sky Capital investors to purchase a total of approximately 65,000 shares of SKE in return for undisclosed commissions that CLYBURN and others received.

  c. On or about November 3, 2005, CLYBURN, working with another broker at Sky Capital, engineered a series of trades to swap investors' stock holdings in SKE and SKH.

  d. On or about March 10, 2006, CLYBURN, working with other brokers at Sky Capital, participated in a series of trades in SKE to "cross out" orders to sell a total of approximately 49,400 shares of SKE.

  (Title 18, United States Code, Section 371)

## COUNT TWO

### (Securities Fraud)

The United States Attorney further charges:

28. The allegations contained in paragraphs 1 through 21 and 26 through 27 of this Information are repeated and realleged as if fully set forth herein.

29. From in or about 2000 through in or about Summer 2006, MCKYLE CLYBURN, the defendant, unlawfully, willfully, and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, as set forth above, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud, (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon purchasers and sellers of Sky Capital securities.

(Title 15, United States Code, Sections 78j(b) and 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5;
Title 18 United States Code, Section 2.)

## FORFEITURE ALLEGATIONS

30. As a result of committing one or more of the offenses charged in Counts One and Two of this Information, to wit, conspiracy to commit fraud in the sale of securities, mail fraud and wire fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Sections 371, 1341, 1343 and 2 (Count One), and fraud in the sale of securities, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5 (Count Two), MCKYLE CLYBURN, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the said offenses, including but not limited to a sum of money representing the proceeds obtained as a result of the charged conspiracy and securities fraud offenses alleged in this Information.

### Substitute Asset Provision

31. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third person;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b), and Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendants up to the value of the forfeitable property described above.

   (Title 18, United States Code, Sections 981(a)(1)(C)
   and Title 28, United States Code, Section 2461(c)).

*[signature]*
LEV L. DASSIN
ACTING UNITED STATES ATTORNEY